United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ESTATE OF YANIRA SERRANO, et al.,

    Plaintiffs,

    v.

MENH TRIEU, et al.,

    Defendants.
_____/

No. C-14-4081 MMC

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FEDERAL CLAIMS; DISMISSING WITHOUT PREJUDICE STATE LAW CLAIMS PURSUANT TO 28 U.S.C. § 1367(c)(3)**

    Before the Court is the "Motion for Summary Judgment on Plaintiffs' Remaining Federal Claims," filed January 29, 2016, by defendants Menh Trieu and the County of San Mateo, pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] Plaintiffs Carmen Garcia, Ignacio Serrano, and Lorenzo Serrano have filed opposition, to which defendants have replied. Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[2]

---

[1] By order filed January 26, 2016, all claims against Defendants Julian Venci and Judy Husary were dismissed pursuant to Rule 41(a)(1)(A)(ii).

[2] By order filed March 1, 2016, the Court found the matter appropriate for decision on the parties' respective written submissions, vacated the hearing scheduled for March 4, 2016, and took the matter under submission.

**BACKGROUND**[3]

Plaintiffs Carmen Garcia, Ignacio Serrano, and Lorenzo Serrano are, respectively, the mother, father, and brother of Yanira Serrano (hereinafter, "Ms. Serrano"), a mentally ill individual who, on the night of June 3, 2014, was fatally shot by defendant Menh Trieu, a Deputy in the San Mateo County Sheriff's Office.

At 9:23 p.m. on the evening in question, in response to a report of a "violent 5150,"[4] San Mateo County Public Safety Communications dispatched police, fire, and medical services to the Serrano residence, located at 1 Maidenhair Walk Lane, within the Moonridge Community Housing Development, which is located just outside the city of Half Moon Bay.[5] (See Trieu Decl. at 2:2-11; 2:20-22.) In issuing said communication, the dispatcher stated that the subject of the "5150" was an eighteen-year-old schizophrenic woman named Yanira Serrano, that she had not taken her medication and was "being violent," and, consequently, that the fire and medical response teams would "stage away from the scene until it was secure[d]" by police. (See id. at 3:4-8.)

Having heard the dispatch, Deputy Menh Trieu ("Deputy Trieu"), who at the time was on patrol in the city of Half Moon Bay proceeded, in his marked patrol car, toward the housing development. (See Trieu Decl. at 2:12-14; 3:11.) His partner, Deputy Richard Chaput, was driving a separate patrol car that evening and also responded. (See id. at 2:16-18; 3:13-14.) Upon arriving at the housing development, the deputies took different routes to look for 1 Maidenhair Walk Lane, as neither knew its precise location. (See id. at 3:18-21.)

---

[3]The facts set forth below are either undisputed or read in the light most favorable to plaintiffs.

[4]See Cal. Welf. & Inst. Code § 5150(a) (providing "[w]hen a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention").

[5]The Moonridge Community Housing Development contains approximately 150 duplex- and fourplex-style residences. (See Trieu Decl. at 2:4-5.)

1       While the deputies searched for the correct residence, the dispatcher provided periodic updates on the developing situation at 1 Maidenhair Walk Lane. The dispatcher first advised that Ms. Serrano had left the residence and entered a brown Land Rover in front of the home. (See Trieu Decl. at 3:24-26.) Thereafter, the dispatcher reported that Ms. Serrano had taken her medication, was calmer, had not been violent previously but instead had only been yelling at her mother, and was returning to the residence. (See id. at 4:4-5.) Later, however, the dispatcher cautioned that Ms. Serrano had obtained a knife and had exited the home with it, and that the 9-1-1 caller was asking her to relinquish it. (See id. at 4:6-13; Ely Decl. Ex. A (Deposition of Lorenzo Serrano) at 17:7-23.)

      After obtaining additional information about the location of the residence via radio from another responding officer, Deputy Trieu parked around the corner from where he believed the residence to be and turned on his parking lights. (See Trieu Decl. at 4:7-9; 4:18-23.) Wearing a "utility belt" containing his firearm, a Taser gun, pepper spray, a baton, and handcuffs, he exited his patrol car (see id. at 2:15-16; 4:20-21) and ran toward the residence (see Casillas Decl. Ex. 2 (Deposition of Lorenzo Serrano) at 52:16-17).[6]

      As he approached, Deputy Trieu heard agitated yelling and saw three individuals whom he later identified as Ms. Serrano's parents, Carmen Garcia and Ignacio Serrano, and brother, Lorenzo Serrano, "in the vicinity" of where he thought the residence was located. (See Trieu Decl. at 4:25-28.) At the time of his arrival, Ms. Serrano was on the front porch of the residence. (See Casillas Decl. Ex. 3 (Deposition of Carmen Garcia) at 49:10-11.)

      When Ms. Serrano saw Deputy Trieu, she first "took two steps backwards," i.e., away from the road (see Casillas Decl. Ex. 2 at 48:1-5), but then, screaming and wielding

---

[6]The parties dispute the manner in which Deputy Trieu approached the Serrano residence. Plaintiffs contend he was "run[ning]," "charging," and "lunging" (see Casillas Decl. Ex. 3 at 49:1-4; Ex. 2 at 52:16-17), while defendants contend he was walking (see Trieu Decl. at 4:23). Resolving the dispute in favor of the nonmoving party, the Court will assume Deputy Trieu ran toward the residence.

3

the knife (see Trieu Decl. at 5:6-7), began to walk[7] toward Deputy Trieu's location (see Casillas Decl. Ex. 3 at 49:25-50:1).  Upon realizing that Ms. Serrano was advancing toward Deputy Trieu, Lorenzo Serrano turned toward Deputy Trieu and warned "Watch out!  Watch out!"  (See Trieu Decl. at 5:5-6; Ely Decl. Ex. A at 44:4-13.)[8]  Ms. Serrano was overweight[9] and moved toward Deputy Trieu with a "limping" gait due to a "vague deformity" in her left foot.  (See Casillas Decl. Ex. 2 at 56:2-15; Casillas Decl. Ex. 5 (Deposition of Dyanna Ruiz-Huerta) at 12:18-20; Casillas Decl. Ex. 8 (Autopsy Report) at 5:26.)  The knife she held was a steak knife, eleven inches in length, with a six-inch blade, pointed tip, and wooden handle.  (See Ho Decl. ¶ 3; Ex. A (photographs of knife).)

Reacting to Ms. Serrano's approach, Deputy Trieu stepped into the street, positioned himself between two parked vehicles, and repeatedly yelled "Hey!" at Ms. Serrano.  (See Trieu Decl. at 5:11-14.)  As she continued to move toward him, Deputy Trieu "backpedaled" down the block away from her and in the direction of his parked patrol car.  (See id. at 5:17-19.)  Ms. Serrano followed, holding the knife upraised above her

---

[7]The parties dispute the pace at which Ms. Serrano first moved toward Deputy Trieu. (See Casillas Decl. Ex. 3 at 49:25-50:1 ("Yanira started walking slowly and she started to follow the police officer."); Trieu Decl. at 5:6 ("I saw that Ms. Serrano was screaming and running towards me.").)  Construing the facts in the light most favorable to plaintiffs, the Court assumes Ms. Serrano initially walked toward Deputy Trieu.

[8]Neither party points to direct evidence on the issue of how close Deputy Trieu was to Ms. Serrano at the moment she began to advance toward him while holding the knife. Although Lorenzo Serrano testified that Deputy Trieu was "charging" toward Ms. Serrano (see Casillas Decl. Ex. 2 at 52:16), given plaintiffs' evidence that Ms. Serrano began to walk in Deputy Trieu's direction without immediately reaching him and that Lorenzo Serrano had to warn Deputy Trieu that Ms. Serrano was armed with a knife (see Casillas Decl. Ex. 2 at 44:21-23), the Court does not understand Lorenzo Serrano's testimony to suggest that Deputy Trieu was in close proximity to Ms. Serrano when she began to advance on him, but, rather, that Deputy Trieu was, at that time, proceeding toward the Serrano residence at a quick pace.

[9]Ms. Serrano was 5' 2" tall and weighed 207 pounds.  (See Casillas Decl. Ex. 8 (Autopsy Report) at 1:22.)

4

1 shoulder.  (See id. at 6:2; Ely Decl. Ex. E (Recorded Interview of Endelisa Huerta and
2 Dyanna Ruiz-Huerta)[10] at 37:23-38:5.)

3       Sensing that Ms. Serrano was closing the gap between them, Deputy Trieu turned
4 around and began to run down the street in a forward-facing direction.  (See Trieu Decl. at
5 5:26-27.)  Over his shoulder and as he was running away from her, he commanded her to
6 "stop."  (See id. at 5:28; Ely Decl. Ex. D (Deposition of Dyanna Ruiz-Huerta) at 22:10-17.)
7 Ms. Serrano did not comply with that order, nor did she lower the knife.  (See Trieu Decl. at
8 6:1.)  Instead, she continued to pursue him, looking "angry and threatening" (see id. at 6:7;
9 Ely Decl. Ex. D at 21:4-7) and shouting in Spanish "Puta!," "Leave!," and "You are not going
10 to take me, you are not going to take me."[11]  (See Ely Decl. Ex. D at 21:11-20; Ely Decl. Ex.
11 F (Deposition of Isabel Morelos) at 14:1-9.)

12       When Deputy Trieu reached the corner of the block on which his patrol car was
13 parked, he veered toward the car and Ms. Serrano followed.  After running past his patrol
14 car (see Trieu Decl. at 6:8), and having retreated for a total of approximately 160 feet (see
15 Ely Decl. Ex. C (Report of Craig Fries)[12] at 18), Deputy Trieu turned back toward Ms.
16 Serrano, drew his firearm, pointed it at her, and again ordered her to "stop."  (See Trieu
17 Decl. at 6:10-11.)  She did not slow her pace.  (See id. at 6:11.)  When she was fifteen to
18 twenty feet from where Deputy Trieu stood (see Casillas Decl. Ex. 6 (Recorded Interview of
19 Endelisa Huerta and Dyanna Ruiz-Huerta) at 37:1-11),[13] he fired a single shot, which struck

---

[10]Although the interview of Endelisa Huerta and Dyanna Ruiz-Huerta is not under oath, the Court has considered Dyanna Ruiz-Huerta's statements therein, as neither party has objected to and, indeed, both parties' briefs cite to, said statements.

[11]Deputy Trieu heard Ms. Serrano yelling, but could not understand what she was saying.  (See Trieu Decl. at 6:2-3.)

[12]While plaintiffs are correct that Mr. Fries's estimate of the distance and speed at which Deputy Trieu and Ms. Serrano traveled is based on Deputy Trieu's testimony about where the chase began and ended, plaintiffs point to no evidence that contradicts such testimony, nor do they offer any other reason why Mr. Fries's calculations are unreliable.

[13]The parties dispute whether Ms. Serrano was within eight feet or fifteen to twenty feet of Deputy Trieu when he shot her.  Resolving the dispute in favor of plaintiffs, the Court assumes that they were fifteen to twenty feet apart.  While defendants argue the estimate

her in the torso and caused her to fall to the ground.  (See Trieu Decl. at 6:11-12.)  Ms. Serrano died from the gunshot wound.  (See Casillas Decl. Ex. 8.)  Approximately 12.5 seconds elapsed from the time Ms. Serrano began to chase Deputy Trieu to the time she was shot.  (See Ely Decl. Ex. C at 18.)

Based on the above, plaintiffs assert (1) a cause of action against Deputy Trieu under 42 U.S.C. § 1983, alleging Deputy Trieu violated Ms. Serrano's Fourth Amendment rights by using excessive force against her (First Claim for Relief), and (2) a cause of action against both defendants under § 1983, alleging a violation of plaintiffs' Fourteenth Amendment rights based on their having been deprived of a familial relationship with Ms. Serrano (Third Claim for Relief); additionally, plaintiffs assert, as against both defendants, state law causes of action for battery, wrongful death, and survivorship (Fourth, Fifth, and Sixth Claims for Relief).[14]  By the instant motion, defendants move for summary judgment on plaintiffs' remaining federal causes of action.

## LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material

---

of fifteen to twenty feet has no support in the record, the Court disagrees.  In responding to the question of "how far away was [Ms. Serrano] when she was . . . running after the police officer and yelling," Dyanna Ruiz-Huerta, the only eyewitness to the shooting other than Deputy Trieu and Ms. Serrano, stated that Ms. Serrano was "a couple of feet away . . . probably like . . . 15, 20 feet away."  (See Ely Decl. Ex. E, at 37:1-6.)  When asked to clarify whether "it was . . . the length of a car or less than the length of a car," Ms. Ruiz-Huerta said "a little more."  (See id. at 37:8-11.)  Later in the interview, Ms. Ruiz-Huerta stated that Ms. Serrano was a "little more" than a car length away from Deputy Trieu when he shot her.  (See id. at 40:1-11.)  Given that Ms. Ruiz-Huerta equated "a little more" than a car length with "15, 20 feet," and subsequently used "a little more" than a car length to describe the distance between Deputy Trieu and Ms. Serrano at the time of the shooting, Ms. Ruiz-Huerta can be understood to have stated that Ms. Serrano was fifteen to twenty feet from Deputy Trieu at the time of the shooting.

[14]Pursuant to the parties' stipulation, the Court, by order filed January 26, 2016, dismissed as against defendant County of San Mateo their Second Claim for Relief, a § 1983 claim under the Fourth Amendment for municipal liability premised on allegations of unconstitutional customs and practices.

1 fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).

The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact. Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." See Celotex, 477 U.S. at 324 (internal quotation and citation omitted). "When the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations omitted). "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion." See Matsushita, 475 U.S. at 587 (internal quotation and citation omitted).

**DISCUSSION**

Defendants argue there is no constitutional violation, and thus they are entitled to summary judgment on each of the remaining federal causes of action asserted against them.[15] Alternatively, Deputy Trieu asserts he is entitled to qualified immunity.

**A. Fourth Amendment Claim**

"All claims that law enforcement officers have used excessive force–deadly or otherwise–in the course of an arrest must be analyzed under the Fourth Amendment and its 'reasonableness' standard." Smith v. City of Hemet, 394 F.3d 689, 700 (9th Cir. 2005) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)). Because the inquiry as to

---

[15]Defendants have not moved for summary judgment on plaintiffs' state law claims.

7

reasonableness "is fact-sensitive," summary judgment on excessive force claims "should be granted sparingly." See Maxwell v. Cty. of San Diego, 697 F.3d 941, 951 (9th Cir. 2012). Such claims may be decided as a matter of law, however, "if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." See Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994).

"[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting [him/her], without regard to [his/her] underlying intent or motivation." Graham, 490 U.S. at 397. Determining whether a particular use of force was reasonable requires the Court to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." See id. at 396 (internal quotation and citation omitted). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." See id. at 396-97.

**1. Deputy Trieu's Use of Deadly Force**

A police officer may not use deadly force unless the officer has probable cause to believe the individual "'poses a significant threat of death or serious physical injury to the officer or others'." Smith, 394 F.3d at 704 (quoting Tennessee v. Garner, 471 U.S. 1, 3 (1985)). In that regard, the Supreme Court has set out the following "non-exhaustive list of factors for evaluating reasonableness: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officer[] or others, and (3) whether the suspect actively resisted arrest or attempted to escape." See Maxwell, 697 F.3d at 951 (citing Graham, 490 U.S. at 396). "Other relevant factors include the availability of less

intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to [the] officer[] that the person [he/she] used force against was emotionally disturbed." Glenn v. Washington Cty., 673 F.3d 864, 872 (9th Cir. 2011). Of all the above-listed factors, the Ninth Circuit has held, "[t]he most important factor is whether the individual posed an immediate threat to the safety of the officer[] or others." See id. (internal quotation and citation omitted).

Consistent therewith, the Ninth Circuit has held that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." Smith, 394 F.3d at 704 (en banc) (collecting cases). In Han v. City of Folsom, for example, two officers were summoned to the home of the twenty-three-year-old decedent by his family, who reported that he "had been acting mentally unstable." 551 F. App'x 923, 925 (9th Cir. 2014). Once there, the officers went to the decedent's bedroom, where the officers found the decedent holding a three-to-four-inch camping knife. See id. When the decedent "told the officers to leave . . . and began approaching the officers while holding the knife," the officers shot and killed him. See id. Applying Smith, the Ninth Circuit found the officers' "actions were not objectively unreasonable."[16] See id. (internal quotation and citation omitted) (affirming district court's grant of summary judgment in favor of officers on plaintiffs' excessive force claim).

Relying on the principle set forth in Smith and applied in Han, defendants argue they are entitled to summary judgment because the undisputed evidence shows that Ms. Serrano attempted to assault Deputy Trieu with a knife. Plaintiffs argue summary adjudication is inappropriate because triable issues exist as to whether Ms. Serrano posed a threat to Deputy Trieu and others, and whether Deputy Trieu should have used a lesser

---

[16]Although, in setting out the facts of the case, the Ninth Circuit noted that the two officers had deployed their Tasers, which were ineffective, before shooting the decedent, the Court made no reference to that initial effort in its analysis of whether the officers' use of deadly force was reasonable.

9

degree of force, such as his Taser or pepper spray, to subdue her. The Court addresses below the parties' respective arguments.

### a. Whether a Reasonable Jury Could Find Ms. Serrano Did Not Pose a Threat To Deputy Trieu and Others

Plaintiffs first argue that a reasonable jury could find Ms. Serrano did not pose an immediate threat to Deputy Trieu because she was overweight and had a foot deformity,[17] and because she was fifteen to twenty feet away from Deputy Trieu when he shot her.

There is no evidence, however, nor do plaintiffs argue that Ms. Serrano's weight and foot deformity rendered her physically incapable of lifting the knife and applying enough force to stab Deputy Trieu. See George v. Morris, 736 F.3d 829, 835, 855 (9th Cir. 2013) (affirming district court's denial of summary judgment where plaintiffs presented "medical evidence . . . [that] called into question whether [the decedent] was physically capable of wielding the gun as deputies described"). Nor have plaintiffs presented evidence showing Ms. Serrano's physical limitations would have rendered her incapable of getting close enough to Deputy Trieu to harm him. As discussed above, Ms. Serrano was advancing on Deputy Trieu and was able to get within fifteen to twenty feet of him at the time he stopped retreating, and plaintiffs do not contend Deputy Trieu was obligated to continue to run from her.[18]

---

[17] Although plaintiffs refer to Ms. Serrano as having a "club foot," the only evidence plaintiffs cite in support thereof is the autopsy report, which makes no mention of a club foot. Instead, the autopsy report describes Ms. Serrano as having a "vague deformity of the left foot," and having on each foot scars that "measure[] about 3 inches in length" and "appear to be iatrogenic," i.e., the result of a surgical procedure. (See Casillas Decl. Ex. 8 (Autopsy Report) at 5:23-26.)

[18] Even if plaintiffs had so argued, ample authority exists holding police officers have no duty to retreat. See, e.g., Reed v. Hoy, 909 F.2d 324, 331 (9th Cir. 1989) (concluding duty to retreat would "be inconsistent with police officers' duty to the public"), overruled on other grounds by Virginia v. Moore, 553 U.S. 164, 175 (2008); Tucker v. Las Vegas Metro. Police Dept., 470 F. App'x 627, 630 (9th Cir. 2012) (Tallman, J. concurring) (citing Reed, 909 F.2d at 331) (noting "police officers have no duty to retreat when threatened with physical assault"); see also Cal. Penal Code § 835a ("A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested.").

1    Similarly, there is no evidence that Ms. Serrano was incapable of rapidly closing the
2 gap between herself and Deputy Trieu. Indeed, the uncontradicted evidence presented by
3 defendants is that Ms. Serrano could have traversed the fifteen to twenty feet between
4 herself and Deputy Trieu in less than two seconds. (See Ely Decl. Ex. C (Fries Report) at
5 18 (concluding Ms. Serrano "covered approximately 160 feet from the area of her front
6 porch to [the] location [where] she was shot in 12.5 seconds," which "results in an average
7 foot speed of approximately 13 feet per second")); see also Estate of Larsen ex rel.
8 Sturdivan v. Murr, 511 F.3d 1255, 1261 n.1 (10th Cir. 2008) (noting officer training manual
9 "instructs that knife-wielding persons within 21 feet pose an 'imminent threat' to officers
10 based on the time in which the distance can be closed in an attack"); Chavez v. Las Vegas
11 Metro. Police Dept., 2014 WL 374444, at *8 (D. Nev. 2014) (noting officer training manual
12 counsels that once "individual[] with [an] edged weapon[], such as [a] knife[] . . . gets within
13 21 feet, the individual poses a risk of death or serious physical injury"). Under such
14 circumstances, to require Deputy Trieu to have waited to shoot Ms. Serrano until she was
15 any closer to him would be to unjustifiably put Deputy Trieu's life at risk by affording him too
16 narrow a window in which to react to her attack. See Estate of Larsen, 511 F.3d at
17 1260-61 (finding "no genuine issue of material fact" where parties disputed whether
18 decedent, who was armed with knife and advancing on officer, was seven or twenty feet
19 away when officer shot him; holding a "reasonable officer need not await the 'glint of steel'
20 before taking self-protective action" because "by then, it is often too late to take safety
21 precautions") (internal quotations and citations omitted) (emphasis in original).
22    Given the threat posed to Deputy Trieu, the Court finds unpersuasive plaintiffs'
23 argument that summary judgment should be denied because Ms. Serrano posed no threat
24 to the public, or at least none of which Deputy Trieu was aware. (See Casillas Decl. Ex. 1
25 (Deposition of Menh Trieu) at 268:5-8 (stating, at time of shooting, he did not see any of
26 "the family members in [his] immediate vicinity"). Rather, the threat to Deputy Trieu alone
27 was enough to justify his use of deadly force. See, e.g., Wilkinson v. Torres, 610 F.3d 546,
28

11

551 n.3 (9th Cir. 2010) (finding threat to safety of officers justified their use of deadly force even though decedent did not "pose[] a risk to the public at large").[19]

### b. Whether a Reasonable Jury Could Find a Clear Alternative Method of Subduing Ms. Serrano Was Available

Plaintiffs next argue summary judgment is inappropriate because a reasonable jury could find Deputy Trieu could have used less intrusive means, namely his Taser or pepper spray, to subdue Ms. Serrano. The Court again disagrees. "Officers need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct [the courts have identified] as reasonable." Glenn, 673 F.3d at 876 (internal quotation and citation omitted). In that regard, an officer must "consider what other tactics if any were available," and only "if there were clear, reasonable and less intrusive alternatives to the force employed" does this factor weigh "against finding the use of force reasonable." See id. (internal quotation and citation omitted). Here, defendants have presented undisputed evidence that Deputy Trieu considered using his Taser and pepper spray and, given a number of concerns, reasonably concluded that neither presented a viable alternative under the circumstances.

Specifically, as to the Taser, Deputy Trieu avers that he feared he would not have "sufficient time to use [his] Taser . . . [because the] Taser had a snap and buckle making it slower to draw than [his] gun," and he also was concerned that "the Taser prongs would not make contact with Ms. Serrano's body as she was advancing towards [him] due the wind, the distance, her movement, and the apparent thickness of the sweater/hoodie that she was wearing." (See Trieu Decl. at 6:25-7:1.) Further, in Deputy Trieu's experience, a Taser was not always reliable (see id. at 7:1-4 (noting that on a previous occasion, he "had

---

[19]Moreover, plaintiffs understate the danger posed to bystanders. Ms. Serrano "was not in a confined area and there were other people in the vicinity," see Reynolds v. Cty. of San Diego, 84 F.3d 1162, 1168 (9th Cir. 1996), namely, three of Ms. Serrano's family members, who had summoned the police because Ms. Serrano was "being violent" toward them (see Trieu Decl. at 3:5.), as well as at least two of the Serranos' neighbors, who were in close enough proximity to witness parts of the incident. (See Casillas Decl. Ex. 5 at 37; Ely Decl. Ex. F at 13:16-14:11.)

1 attempted to use [his] Taser on a suspect who had attacked [him]" but "only one prong
2 connected with the suspect leading to his escape")), and, consistent therewith, he was
3 trained "that in a situation involving a lethal threat . . . a Taser should only be used when a
4 partner is present to provide lethal cover."  (See id. at 7:5-7); see also Han, 551 F. App'x at
5 925 (noting two officers fired their Tasers and "both were ineffective").

As to pepper spray, Deputy Trieu avers that such substance "needs to be deployed
precisely in the eyes," that "it was unlikely [he] could [have] deploy[ed] the pepper spray
with that degree of accuracy given the moving target and dynamic outdoor conditions that
include[d] wind," and "even if it is precisely deployed, pepper spray is not always reliable in
immediately stopping an assaultive or combative subject."  (See Trieu Decl. at 7:9-14.)
Given such circumstances, Deputy Trieu felt he might not have enough time to "draw,
manipulate, and accurately direct" his pepper spray before Ms. Serrano reached where he
stood.  (See id. at 7:15-18.).  Moreover, as with the use of a Taser, Deputy Trieu was
trained to only use pepper spray "when a partner is present to provide lethal cover."  (See
id. at 7:14-15.)

In light of the record presented, the Court finds plaintiffs have failed to raise a triable
issue as to the reasonableness of Deputy Trieu's decision not to use a lesser means of
force.

### c. Whether a Reasonable Jury Could Find Deputy Trieu Issued an Inadequate Warning

"[W]arnings should be given, when feasible, if the use of force may result in serious
injury."  Glenn, 673 F.3d at 876.  Here, Deputy Trieu twice warned Ms. Serrano to "stop,"
and the consequences of failing to comply were apparent, in that Deputy Trieu had his
firearm trained on Ms. Serrano when he instructed her to "stop" the second time.  See Hill
v. Bay Area Rapid Transit District, 2013 WL 5272957, at *6 (N.D. Cal. 2013) (noting where
officer "had his gun pointed at [decedent]" at time officer ordered decedent to drop his
knife, "the consequences of a failure to comply with the command should have been
clear").  Plaintiffs do not argue, nor could a jury reasonably find, it was feasible for Deputy

13

Trieu to issue more fully stated warnings, as the encounter lasted only 12.5 seconds, during the entirety of which time Ms. Serrano was chasing Deputy Trieu.  See Deorle v. Rutherford, 272 F.3d 1272, 1284 (9th Cir. 2001) (considering whether there was time to give specific order or warning).

### d. Whether a Reasonable Jury Could Find Deputy Trieu's Use of Force Was Unreasonable Because Ms. Serrano Was Mentally Disturbed

Although the Ninth Circuit has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals," it has observed that "in the usual case" involving a mentally ill individual, i.e., one in which the person is "neither a threat to himself nor to anyone else," the use of force to detain such person may be unreasonable even though such individual was "acting out and inviting officers to use deadly force to subdue him."  See Bryan, 630 F.3d at 829 (internal quotation and citation omitted).  As set forth above, however, the instant encounter was not "the usual case." Rather, Ms. Serrano posed a significant threat to the life of Deputy Trieu, and a danger not only to her family members, but to other residents of the housing development who were present at the scene.  See Blanford v. Sacramento Cty., 406 F.3d 1110, 1117 (9th Cir. 2005) (concluding that, even though plaintiff "appeared emotionally disturbed," it was "not objectively unreasonable" for officers "to consider that securing [plaintiff's] sword was a priority" and to use deadly force to that end).

### e. Conclusion: Reasonableness of Deputy Trieu's Use of Deadly Force

Considering the above factors both independently and cumulatively, and viewing the evidence in the light most favorable to plaintiffs, the Court finds plaintiffs have failed to raise a triable issue as to their claim that Deputy Trieu's use of deadly force was unreasonable. The Court next turns to the question of whether Deputy Trieu nonetheless violated Ms. Serrano's Fourth Amendment rights by provoking the confrontation that resulted in her death.

//
//

### 2. Provocation

Even if an eventual use of force is reasonable, "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, [the officer] may be held liable for his otherwise defensive use of deadly force." See Billington v. Smith, 292 F.3d 1117, 1189 (9th Cir. 2002). "[I]f an officer's pre-shooting conduct negligently provokes a suspect to violence," however, "'that negligent conduct will not transform an otherwise reasonable subsequent use of force into a Fourth Amendment violation.'" See Han, 551 F. App'x at 925 (quoting Billington, 292 F.3d at 1190) (emphasis added).

Plaintiffs contend Deputy Trieu provoked the confrontation with Ms. Serrano by running toward the Serrano residence where Ms. Serrano was standing on the porch,[20] as well as by failing to wait for his partner and failing to develop a tactical plan before approaching the residence. None of those facts, however, will support a finding that Deputy Trieu violated the Fourth Amendment. First, plaintiffs cite to no authority in support of the proposition that the speed at which an officer moves could constitute an illegal search or seizure, and therefore "an independent Fourth Amendment violation." See Billington, 292 F.3d at 1189. Moreover, police officers may "move quickly if delay would gravely endanger their lives or the lives of others." See City and Cty. of San Francisco v. Sheehan, 135 S. Ct. 1765, 1775 (2015) (internal quotation and citation omitted). Here, as noted, Deputy Trieu was responding to a call concerning an armed, mentally disturbed individual, who was acting in a violent manner in a residential area.

As to Deputy Trieu's failure to wait for his partner and failure to develop a tactical plan, Ninth Circuit precedent is clear that a plaintiff cannot "establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have

---

[20] In their opposition, plaintiffs argue that Deputy Trieu "charge[d] into the scene with his gun drawn." (See Pl.'s Opp. at 13:11.) As defendants point out, however, plaintiffs fail to cite any evidence in support of plaintiffs' assertion that Deputy Trieu had his gun drawn as he approached the Serrano residence.

been avoided." See Billington, 292 F.3d at 1190-91 (finding officer had not intentionally or recklessly provoked confrontation with decedent where officer failed to wait for "backup [to] arrive"); George, 736 F.3d at 839 n.14 (rejecting plaintiff's arguments that deputies had violated Fourth Amendment by not "gathering intelligence . . . before heading to the backyard" where decedent was located and by "failing to set up a non-confrontational, soft perimeter around the house"; finding "[a]t most, [such] failings amount to negligence"). Moreover, in this instance, had Deputy Trieu waited for his partner to arrive or until after devising a tactical plan, the situation may well have resulted in injury to one or more of the people who were present, at least one of whom had been endeavoring, without success, to get Ms. Serrano to relinquish her weapon.

Accordingly, plaintiffs fail to raise a triable issue with respect to provocation, and consequently, fail to raise a triable issue as to their claim that Deputy Trieu violated Ms. Serrano's Fourth Amendment rights.

**B. Fourteenth Amendment Claims**

Plaintiffs also assert, as against both defendants, a claim under § 1983 for loss of their familial relationship with Ms. Serrano as a result of Deputy Trieu's use of force. "[P]arents have a Fourteenth Amendment liberty interest in the companionship and society of their children," and "[o]fficial conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process." See Wilkinson, 610 F.3d at 554.

Here, as an initial matter, the parties disagree as to the applicable legal standard. "Where actual deliberation is practical, . . . an officer's 'deliberate indifference' may suffice to shock the conscience," but "where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." See id. Contrary to plaintiffs' conclusory argument that "Deputy Trieu had time to deliberate before he shot" Ms. Serrano (see Pl.'s Opp. at 18:7), the undisputed evidence shows that the encounter lasted only 12.5 seconds, which period did not allow enough time for Deputy

Trieu to "actual[ly] deliberat[e]." See, e.g., Porter v. Osborn, 546 F.3d 1131, 1139 (9th Cir. 2008) (holding "purpose to harm" standard applied; finding officer did not have time to actually deliberate during "five-minute altercation" between officer and decedent that was "quickly evolving and escalating, prompting 'repeated split-second decisions'").

As to the merits of the claim, plaintiffs offer two undisputed facts from which a jury could, according to plaintiffs, infer that Deputy Trieu acted with a purpose to harm Ms. Serrano. First, Deputy Trieu put on gloves before he exited his vehicle, which, according to plaintiffs, suggests that "Deputy Trieu intended to have meaningful physical contact with Yanira Serrano and to inflict harm" (see Pl.'s Opp. at 18:12-13), and second, Deputy Trieu purposefully, as opposed to accidentally, shot Ms. Serrano. Neither such fact is sufficient, whether considered independently or cumulatively, to support a jury finding that Deputy Trieu acted "maliciously or sadistically for the very purpose of causing harm." See Cty. of Sacramento v. Lewis, 523 U.S. 833, 852-53 (1998). As to the former, Deputy Trieu's undisputed testimony is that he wore gloves to be "cautious" and protect against any disease transmittable by contact with body fluids. (See Casillas Decl. Ex. 1 at 191:10-193:15.) As to the latter, where, as here, an officer's use of deadly force is justified, such force cannot form the basis of a finding that an officer acted with a "purpose to harm unrelated to legitimate law enforcement objectives." See Wilkinson, 610 F.3d at 554 (finding "mere fact that [officer] shot [decedent]" was not evidence of intent to harm "separate from a legitimate law enforcement objective").

Accordingly, plaintiffs have failed to raise a triable issue with respect to their Due Process claim.[21]

**C. State Law Claims**

Although it appears to the Court that the viability of plaintiffs' state law claims is contingent on the viability of the federal claims resolved above, see, e.g., Edson v. City of

---

[21] Given the above findings, the Court does not address herein the parties' arguments as to qualified immunity.

17

Anaheim, 63 Cal. App. 4th 1269, 1272-74 (1998) (holding, to prevail in wrongful death suit alleging police officer committed battery, plaintiff must, as in federal action under § 1983, prove police officer used unreasonable force), defendants, as noted, have not moved for summary judgment on the state law claims. As plaintiffs' state law claims are the only claims remaining, the Court will dismiss those claims without prejudice to plaintiffs' re-filing them in state court. See 28 U.S.C. § 1367(c)(3); United Mine Workers of America v. Gibbs, 383 U.S. 715, 725-26 (1966) (holding "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); Gini v. Las Vegas Metro. Police Dept., 40 F.3d 1041, 1046 (9th Cir. 1994) ("In the usual case in which federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state law claims.") (emphasis omitted).

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment on plaintiffs' federal claims is hereby GRANTED, and plaintiffs' state law claims are hereby DISMISSED without prejudice.

**IT IS SO ORDERED.**

Dated: March 21, 2016

MAXINE M. CHESNEY
United States District Judge